FILED

2005 Mar-30  PM 02:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN  DIVISION**

| | | |
|---|---|---|
| **THE BANC CORPORATION,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | **CV-03-BE-2646-S** |
| | ] | |
| **PROGRESSIVE CASUALTY** | ] | |
| **INSURANCE COMPANY,** | ] | |
| | ] | |
| **Defendant.** | ] | |

**MEMORANDUM OPINION**

This case comes before the court on "Defendant Progressive Casualty Insurance Company's Motion for Summary Judgment and Memorandum Brief in Support Thereof" (doc. # 18).  The matter has been fully briefed by each side.  Plaintiff The Banc Corporation[1] initiated this action, claiming that Progressive wrongfully denied coverage under a financial Institution Bond issued by Progressive to The Bank.  The two-count complaint seeks damages for breach of contract and for bad faith failure to pay.  The Defendant's motion addresses the question of coverage under the "dishonest or fraudulent acts" provision of the bond.[2]  Because the court finds that the actions of The Bank employee John Thornton do not meet the policy requirements for dishonest or fraudulent acts, the court finds that Progressive owes no additional coverage under

---

[1]The Banc Corporation is the holding company that owns 99.7% of the named insured, The Bank, under the Progressive Financial Institution Bond at issue in this case.  For convenience, the court will refer to both entities as "The Bank."

[2]Progressive paid the full $100,000 limits of liability under the check kiting coverage of the bond prior to suit and that coverage is not at issue here.

the bond and has not breached its contract.  Summary judgment on the coverage issue is therefore granted.  Without a breach of contract, Plaintiff's claim for bad faith must fail.  Therefore, Defendant Progressive is entitled to Final Summary Judgment on all claims asserted in the complaint.

I.      Facts

The following facts are not contested.  In fact, the plaintiff adopted Exhibits 1 - 11 submitted by Defendant.  The only additional "facts" offered by Plaintiff were the allegations contained in the narrative report in its proof of loss, and excerpts from Thornton's testimony in another trial that did not contradict any of the facts stated by the Defendant.  The allegations of the proof of loss, just as the allegations of a complaint, are insufficient to create a genuine issue of material fact and to defeat a properly-supported motion for summary judgment.  See Fed. R. Civ. P. 56(c).

A.      Background and Check Kiting Schemes.

The Bank hired John Thornton to serve as President of its Decatur branch in June 1998. Thornton had twenty-five years' experience in the banking business, including twenty-plus years in the private sector and three years with the Office of the Comptroller of the Currency.

In the fall of 1998, William Clingerman opened an account at the Decatur branch. Clingerman owned and operated an automobile business known as Auto Gallery.  When he first approached The Bank, Clingerman sought a $100,000 line of credit for his auto business, but loan officer Blake Robbins initially declined the request, as did Thornton.  However, after Clingerman more fully advised Thornton of the nature of his business, which involved the frequent and systematic purchase and resale of automobiles, Thornton agreed to approve the line

of credit.  The two men had no prior relationship.  Thornton understood that with a quick turnaround on the cars, a substantial number of checks would be passing through the Auto Gallery account.

Typically, Clingerman visited the Decatur branch on a daily basis to review printouts of his account, to determine which checks had cleared, and to make deposits.  He did so because he believed the telephone banking system at The Bank was unreliable.  Clingerman's visits usually occurred early in the morning, and, as his relationship with The Bank grew, he was often allowed to enter the bank and review his accounts before regular banking hours.  Thornton was aware that a lot of checks were passing through the Auto Gallery account, but he was not alarmed because he had made a point of understanding Clingerman's business.

Problems with the Auto Gallery account first appeared in December 1998 when Clingerman's name appeared on a kite suspect report.   At the time, The Bank's software system generated the kite suspect reports that were reviewed at The Bank's operations center in Sylacauga, but The Bank did not provide the reports to branch presidents like Thornton. Thornton was not made aware of any potential problem at that time.

The following month, January 1999, Clingerman's name again appeared on the kite suspect report, and his account was also overdrawn.  On that occasion, David Carter, The Bank's CFO, called Thornton to advise him of the report.  Thornton was already aware of the overdrafts and had discussed the matter with Clingerman, who advised Thornton that the problems were being caused by Clingerman's dealings with a fellow auto salesman who was having troubles with his line of credit at his bank and who was searching for a line of credit elsewhere. Clingerman promised Thornton that once the line of credit was secured, the dealer was going to

pay off Clingerman, who would then cure his overdrafts.  Clingerman assured Thornton the

matter would be resolved, and Thornton passed that information on to David Carter.  The

overdrafts were cured just as Clingerman promised.  During Thornton's conversations with him,

Clingerman also denied any wrongful conduct or knowledge of a check kiting scheme.

Thornton would, from time to time, approve overdrafts on the Auto Gallery account, and,

as branch president, he had the discretionary authority to do so.  The amounts approved on these

"daylight overdrafts" were always within Thornton's lending authority.  According to Jimmy

Taylor, Sr., Plaintiff's President and CEO, because of the decentralized structure of The Bank,

The Bank granted Thornton wide latitude in such situations, provided he did not exceed his

lending limit.  Clingerman always resolved these overdrafts, and The Bank had no further

problems with the Auto Gallery account after February until August 1999.

On Monday, August 23, 1999, The Bank altered the manner in which checks were

processed.  The Decatur branch began using a courier service to deliver the actual checks to the

Operations Center on a daily basis.  This new method shortened the time for presentment of the

checks to the Federal Reserve and reduced the duration of the "float."  This change contributed to

the discovery of Clingerman's kite.

On Wednesday, August 25, 1999, Thornton received a call from Terry Tate of North

Alabama Bank ("NAB").  Tate claimed to be holding a single check, drawn on the Auto Gallery

account, for deposit into the account of Riggs' Wholesale.  Tate wanted assurances that sufficient

funds were in the Auto Gallery account to cover the check, and upon being advised by Thornton

that there were not, Tate requested a cashiers' check to substitute for the Auto Gallery check.

Thornton refused that request.  Tate's call relative to a single check did not cause Thornton any

4

alarm, given Thornton's knowledge of Clingerman's business.  He did not report this call to anyone else with The Bank.

The following day, Thursday, August 26, 1999, a second NAB banker, Vice President Bryant Hovis, called Thornton and tried to collect on some checks drawn on Auto Gallery and deposited into the Riggs Wholesale account at NAB.  According to Hovis, Thornton again refused to issue cashiers' checks to stand for the Auto Gallery checks but told Hovis that if he ran the checks again, they would be paid.  Hovis did not tell Thornton on this occasion that any checks were being returned.

On Friday, August 27, 1999, personnel at the Sylacauga Operations Center noticed a $3.5 million decrease in The Bank's Federal Reserve funds.  An employee in the Decatur branch called Thornton and advised him of the problem that appeared to have been caused by Clingerman.   Additional calls followed and Thornton obtained enough information to believe that a problem existed, but his knowledge of Clingerman's business and his typical banking transactions minimized some of his concerns.

On August 30, 1999, the existence of a kiting scheme came to light in a meeting with Thornton, Jimmy Taylor, Jr., The Bank's Executive Vice President and General Counsel, Clingerman, and David Riggs, The NAB customer.  Clingerman admitted that he and Riggs had never met and that Greg Steenson, another auto dealer, was the middleman between them. Thereafter, Taylor and Riggs visited NAB, and Riggs received a cashier's check in the approximate amount of $800,000 as the proceeds of his account at NAB.  He turned the cashier's check over to The Bank.

Following its investigation of the Clingerman/Steenson/Riggs kite, The Bank claimed

5

losses in the amount of approximately $2.695 million.  The investigation also disclosed the existence of a second purported kite, this one involving Clingerman and Dr. Paul Wilson, who maintained an account at The Bank in Huntsville.[3]

Shortly after the kites were discovered, The Bank placed Thornton on administrative leave and terminated his employment on November 15, 1999.

Clingerman pled guilty to criminal charges arising from the kite.  Likewise, Greg Steenson, David Riggs, Bryant Hovis (the banker from NAB), and a fourth individual, Robert Cagle, have all pled guilty to criminal charges.  No criminal charges have ever been brought against John Thornton.  Jimmy Taylor, Jr., who spearheaded the investigation for The Bank in the wake of these events, could not say that Thornton was involved in the kites.  Jimmy Taylor, Sr., Plaintiff's President and CEO, stated: "This was a very complex and very sophisticated check kite, and I don't know if anybody completely understands how this thing works."

Thornton did not receive any money from the kites and no evidence suggests that he was a party to it.

On or about March 13, 2000, Plaintiff submitted to Progressive a Proof of Loss containing The Bank's allegations of Thornton's supposed dishonesty.  Before and after the Proof of Loss was filed, both The Bank and Progressive conducted extensive investigations into this matter.  Progressive concluded that The Bank failed to satisfy its burden of establishing coverage under the Bond's dishonesty and manifest intent provisions, and thus the claim under that coverage was never paid.  Progressive paid $100,000, the limit of its liability under the

---

[3]No coverage exists for the Clingerman/Wilson kite because the Check Kiting Fraud Rider requires establishment of two or more accounts in different institutions, not merely separate branches of the same institution.

Check Kiting Fraud Rider.

**B.      The Relevant Provisions of the Financial Institution Bond.**

On or about April 24, 1999, Progressive issued the Bond to The Bank for a three-year

term with a $6,000,000 annual aggregate limit of liability.[4]  *See* Defendant's Exhibit 1, p.1 (doc.

# 19).  The provisions of the Bond relevant to this motion are as follows:

> The Underwriter . . . subject to the Declarations, Insuring
> Agreements, General Agreements, Conditions and Limitations and
> other terms hereof, agrees to indemnify the Insured for:
>
> ---- INSURING AGREEMENTS ----
>
> FIDELITY
>
>> A.      Loss resulting directly from dishonest or fraudulent
>>          acts committed by an Employee acting alone or in
>>          collusion with others.
>>
>>          Such dishonest or fraudulent acts
>>          must be committed by the Employee
>>          with the manifest intent:
>>
>>          (a)      to cause the insured to sustain such loss; and
>>
>>          (b)      to obtain financial benefit for the Employee
>>                   or another person or entity.
>>
>>                          * * * * *
>>          As used throughout this Insuring
>>          Agreement, financial benefit does
>>          not include any employee benefits
>>          earned in the normal course of
>>          employment, including: salaries,
>>          commissions, fees, bonuses,

---

[4]The Banc Corporation is not listed as a named insured on the declarations page.  The named insureds include: Warrior Capital Corporation, The Bank, and Emerald Coast Bank.  The Banc Corporation is the holding corporation that owns 99.7% of the insured, The Bank.

promotions, awards, profit sharing or
pensions.

* * * * *

----CONDITIONS AND LIMITATIONS

* * * * *

Section 2 – EXCLUSIONS

This bond does not cover:
* * * * *

(o)     loss resulting directly or indirectly from payments made or
        withdrawals from a depositor's account involving items of
        deposit which are not finally paid for any reason, including
        but not limited to Forgery or other fraud, except when
        covered under insuring Agreement (A) . . . .

The effect of Exclusion (o) was to exclude coverage for check-kiting losses.  However, the

following rider modified that provision so that kiting losses would be covered up to a limit of

$100,000:

CHECK KITING FRAUD RIDER
* * * * *

It is agreed that the attached bond is amended by modifying
Exclusion (o) to provide coverage as follows:

1.      Indemnification for loss sustained from checks which are
        not finally paid because of a check kiting fraud against the
        Insured defined as follows:

        (a)     Establishment of two or more accounts in
                different Institutions by Insured's depositor,
                or a representative or co-conspirator of the
                Insured's depositor, and

        (b)     the constant, systematic, back and forth
                deposit of funds between two or more
                accounts to create the appearance of valid
                funds, and

8

(c)     involving deposits with the Insured drawn against uncollected funds deposited in another institution to create the appearance of valid funds at that institution, and

(d)     provided such deposits are made as a part of a clear and obvious plan to defraud the Insured, and

(e)     the Insured is in fact deceived by such deposits.

2.     The annual limit of the Underwriter's liability under this endorsement shall not exceed $100,000.  Such liability shall be a part of, and not in addition to, the Single Loss Limit of Liability stated in Item 4 of the Declarations.

\* \* \* \* \*

Nothing contained herein shall be held to vary, alter, waive, or extend any of the terms, conditions, provisions, agreements or limitations of the above mentioned bond or Policy, other than as above stated.

## II.     Standard of Review

When a district court reviews a motion for summary judgment under Federal Rule of Civil Procedure 56, it must determine two things: (1) whether any genuine issues of material fact exist; and, if not, (2) whether the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56 (c).  To succeed, the moving party bears the burden of establishing both prongs of the summary judgment test.  The nonmoving party may defeat the motion for summary judgment by establishing either genuine issues of material fact or that the movant is not entitled to judgment as a matter of law.

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes

9

demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986) (quoting Fed. R. Civ. P. 56).  The party seeking summary judgment can meet this burden by offering evidence showing no dispute of material fact, or by showing that the nonmoving party's evidence fails to meet some element of its case on which it bears the ultimate burden of proof.  *Celotex*, 477 U.S. at 322-23.  Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  477 U.S. at 323.

When the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P 56(e)).  The responding party does not need to present evidence in a form admissible at trial; "however, he may not merely rest on his pleadings."  477 U.S. at 324.  "The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

In responding to a properly-supported motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).  If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 , 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986) (citations omitted); *accord Spence v. Zimmerman*, 873

10

F.2d 256 (11th Cir. 1989).

Substantive law determines which facts are material and which are irrelevant. *Anderson,* 477 U.S. at 248. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." 477 U.S. at 248. Material facts affect the outcome of the trial under governing law. 477 U.S. at 248. To determine whether a material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 249; *Patton v. Triad Guar. Ins. Corp.,* 277 F.3d 1294, 1296 (11th Cir. 2002); *Witter v. Delta Airlines, Inc.,* 138 F.3d 1366, 1369 (11th Cir. 1998).

After both parties have addressed the motion for summary judgment, the court must grant the motion <u>if</u> no genuine issues of material fact exist <u>and if</u> the moving part is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c). In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which the jury could reasonably find for the nonmovant. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc*., 849 F.2d 570, 575 (11th Cir. 1998). The court should not weigh the evidence, or make determinations as to the credibility of witnesses because these decisions fall to the province of the jury. *See Anderson*, 477 U.S. at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). Thus, "the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. "The nonmovant need not be given the benefit of every inference but only of every reasonable inference." *Graham*, 193 F.3d at1282 (quoting *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n. 12 (11th Cir. 1988).

**III.     Breach of Contract Claim**

The Bank claims that Progressive breached its contract by failing to pay under Insuring

Agreement A for the dishonest or fraudulent acts of John Thornton as part of the check kiting

scheme of Clingerman, Riggs and Steenson.  To prevail on a breach of contract action the

Plaintiff must establish: (1) a valid contract existed between the parties; (2) Plaintiff's

performance on the contract; (3) the Defendant's breach or non-performance of the contract; and

(4) damages.  *See Waddell & Reed v. United Investors Life Ins. Co.*, 875 So. 2d 1143, 1165 (Ala.

2003) (quoting *S. Med. Health Sys. v. Vaughn*, 669 So. 2d 98, 99 (Ala. 1995)).  Progressive

properly supported its motion for summary judgment challenging Plaintiff's ability to support its

case.  Thus, The Bank was required to present substantial evidence of each of the elements.  *See*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 586 (1986).  Plaintiff failed to present anything more than conjecture to

establish breach by Progressive.

The question presented for the court is one of law: the interpretation of the requirements

of Insuring Agreement A.  In short, the court must decide whether the contract provision at issue

providing coverage for "loss resulting directly from dishonest or fraudulent acts committed by an

Employee" triggered coverage for the loss sustained by The Bank.  If so, Progressive breached its

duty to pay under the policy; if, however, the facts presented did not trigger coverage,

Progressive did not breach the contract and The Bank's claim fails.

**A.     General Principles of Insurance Contract Interpretation.**

The interpretation of a contract is a question of law capable of being resolved on motion

for summary judgment.  *See Cincinnati Ins. Co. v. Tuscaloosa County Parking &Transit Auth.*,

827 So. 2d 765, 767 (Ala. 2002).  Where "there is no ambiguity, courts must enforce insurance contracts as written and cannot defeat express provisions in a policy, including exclusions from coverage, by making a new contract for the parties." *Id.* (citations omitted).

In addition, the insured bears the burden of establishing a covered loss.  *See Jordan v. Nat'l Accident Ins. Underwriters, Inc.*, 922 F.2d 732, 735 (11th Cir. 1991)(applying Alabama law and citing *Colonial Life & Accident Ins. Co. v. Collins*, 194 So. 2d 532, 535 (Ala.1967)); *Parker Supply Co., Inc. v. Travelers Indem. Co.*, 588 F.2d 180 (5th Cir. 1979) (applying Alabama law).  Progressive has already paid the full amount available under the Check Kiting Fraud Rider.  To establish entitlement to any additional amounts, The Bank would have to prove coverage under Insuring Agreement A.  The Bank's burden is to establish every required element, including dishonesty, under the insuring agreement.

**B.    Policy Requirements**

The  issue of coverage under Insuring Agreement A turns on the provisions of the Financial Institution Bond at issue.  In pertinent part, the Bond, subject to all of its other terms and conditions provides indemnity for

> [l]oss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others.
>
> > Such dishonest or fraudulent acts must be committed by the Employee with the manifest intent:
> >
> > > (a)    to cause the insured to sustain such loss; and
> > >
> > > (b)    to obtain financial benefit for the Employee or another

person or entity.

Thus, the elements of proof necessary to trigger coverage under this provision are (1) the insured must suffer a loss; (2) the loss must have resulted directly from dishonest or fraudulent acts of an employee acting alone or in collusion with others; (3) the acts must have been committed with the manifest intent to cause the insured to suffer the loss; and (4) the acts must have been committed with the manifest intent to obtain a financial benefit for the dishonest employee or a third party, provided the benefit obtained does not fall within the exclusionary clause. *See Resolution Trust Corp. v. Fid. & Deposit Co. of Md.*, 205 F.3d 615, 636 (3d Cir. 2000). Here, The Bank cannot satisfy the second, third, and fourth elements.

1.    **Were Thornton's Acts "Dishonest or Fraudulent"?**

The Bank bore the burden of establishing that Thornton's actions were either dishonest or fraudulent. It failed to demonstrate either.

(a.)  **No Evidence of Dishonest Acts**

"Dishonesty," as used in fidelity bonds, refers to "acts which evinc[e] a want of integrity or intentional breach of trust." *Fid. & Guar. Co. v. Bank of Thorsby*, 46 F.2d 950, 951 (5th Cir. 1931) (applying Alabama law). "Willfulness and an intent to deceive must be present for an employee's actions to be considered dishonest . . . ." *Fed. Deposit Ins. Corp. v. CNA Cas. of P.R.,* 786 F. Supp. 1082, 1087 (D.P.R. 1991).

Instead of pointing to any evidence to support a finding of dishonesty, the Plaintiff argues about circumstantial evidence of Thornton's "willful ignorance" of the check kite (Plaintiff's Br. at 11, doc. 20), "Thornton's willful indifference" (*Id*.), and lists facts that demonstrate "willful ignorance" (*Id*. at p. 14-15). The Plaintiff fails to cite any cases in which "willful ignorance" or

"willful indifference" rose to the level of dishonest acts under a fidelity bond.

In fact, the Plaintiff, in its seven pages of legal argument, only addresses two points – whether Progressive is entitled to Summary Judgment on the bad faith claim and whether the conduct of Thornton rises to the level of manifest intent under the policy language.  It argues that whether Thornton intended to cause injury to The Bank and a benefit to the check kiter is a genuine issue of material fact.  The Plaintiff completely ignores its legal obligation to establish evidence of all the requirements of the policy to trigger coverage.  Granted, intent is often a question for the jury, but Plaintiff's proof totally fails to present even an inference of the preliminary requirement that Thornton's acts were either dishonest or fraudulent.  Although Plaintiff fails to address this preliminary requirement for coverage and the court could simply grant Summary Judgment for that failure to meet its burden, the court will examine the legal requirements and consider what facts have been presented, and all reasonable inferences that could be drawn therefrom in Plaintiff's favor, to decide whether Progressive is entitled to judgment as a matter of law on the dishonesty issue.

The Bank seems to concede in the Proof of Loss that Thornton was guilty of nothing more than poor business judgment for failing to uncover a three-or-four-pronged kite, which his superiors admitted was complex, sophisticated, and incapable of being understood.  Willful indifference or ignorance, poor business judgment, negligence, or incompetence is not sufficient to establish dishonesty.  *See e.g., First Fed. Sav. & Loan Assoc. v. Transamerica Ins. Co.*, 935 F.2d 1164 (10th Cir. 1991) (upholding summary judgment for insurer and finding no dishonesty where loan officer approved loans after the bank's loan committee had rejected them because poor business judgment did not amount to dishonesty); *Fed. Deposit Ins. Corp. v. St. Paul Fire &*

*Marine Ins. Co.*, 942 F.2d 1032 (6th Cir. 1991) (upholding judgment in favor of insurer and finding no dishonesty despite concluding that a bank president's loans to support investments and enterprises in which he had an interest may have constituted a "grave breach of his fiduciary duty"); *Merch's. & Farmers State Bank v. Fid. & Cas. Co.*, 791 F.2d 1141 (5th Cir. 1981) (upholding partial summary judgment for insurer and concluding that employee's knowledge of customer's creditworthiness negated any inference of dishonesty); *Progressive Cas. Co. v. First Bank*, 828 F. Supp. 473 (S.D. Tex. 1993) (awarding summary judgment for insurer and, after noting the lack of evidence of motive, finding no dishonesty where employee "may have been imprudent in taking improper risks and in making loans to friends, and he was clearly wrong in not disclosing material facts to the Board and in not recording all transactions in the proper record, but without more, only speculation can turn that conduct into dishonesty").

Plaintiff's allegations regarding Thornton's conduct are not sufficient to support a finding of dishonesty under these authorities in which courts found no dishonesty on facts more compelling than those present here.  The parties cited no case, and the court could find none, finding dishonesty based on evidence as meager as that offered here.  To the contrary, much more is often required to prove want of integrity or breach of trust than is present in this case.  *See, e.g., Cincinnati Ins. Co. v. Tuscaloosa County Parking & Transit Auth.*, 827 So. 2d 765 (Ala. 2002) (recognizing dishonesty where employees embezzled funds by issuing payroll checks to themselves in excess of their salaries, by using company credit cards for personal use, and by receiving kickbacks from fraudulent invoices); *Fid. & Guar. Co. v. Bank of Thorsby*, 46 F.2d 950 (5th Cir. 1931) (bank cashier, in violation of bank policy and state law, extended loans via overdrafts and concealed the loans by making false entries on the books); *Affiliated Bank/Morton*

16

*Grove v. Hartford Acc. & Indem. Co.*, No. 91 C 4446, 1992 WL 91761 (N.D. Ill. Apr. 23, 1992) (denying summary judgment for insurer on facts demonstrating that bank officer, desirous of concealing his customer's financial problems, instructed customer to operate a kite and also temporarily transferred funds from other bank customers into that customer's account to prevent the customer's overdraft from appearing on overdraft reports).

By contrast, the undisputed evidence in this case lacks <u>any</u> proof – or even any inference – that Thornton embezzled, received kickbacks, made false entries in the books, instructed Clingerman to operate a kite, or played fast and loose with other account-holders' funds to cover up any improper activities.   Thornton's conduct is readily distinguishable and does not rise to the level of dishonesty.

### (b.)    No Evidence of Fraudulent Acts

The language of the bond requires proof of <u>either</u> dishonest acts <u>or</u> fraudulent acts. Therefore, Plaintiff could meet its preliminary obligation to trigger coverage, subject to other policy requirements, upon evidence of fraud in spite of lack of evidence of dishonesty.  However, Plaintiff failed to present any evidence of fraud and did not even discuss fraud in its brief.  In an abundance of caution, however, the court examines the facts before it for any evidence of fraudulent acts by Thornton that fall within the coverage of the bond.

"Fraudulent" conduct includes affirmative misrepresentations, suppression or concealment, and even reckless misrepresentations made in conscious disregard of known facts. *See* ALA. CODE § 6-5-101, -102 (1975); *Hartford Accident & Indem. Co. v. Weil Bros.*, 41 F.2d 171 (5th Cir. 1930) (holding that false representations and concealment are "fraudulent" within the meaning of a fidelity bond); *Alagold Corp. v. Freeman*, 20 F. Supp. 2d 1305, 1311 (M.D.

17

Ala. 1998) (suppression as fraud); *Foremost Ins. Co. v. Parham*, 693 So. 2d 409, 422 (Ala. 1997).  In opposing summary judgment, Plaintiff must not merely present substantial evidence of fraud but must rather demonstrate substantial evidence that, if accepted by a jury, would constitute clear and convincing proof of fraud or suppression.  *See ITT Specialty Risk Servs., Inc. v. Barr*, 842 So. 2d 638, 646 (Ala. 2002).

As noted, the Plaintiff failed to address the question of fraudulent acts in its brief. However, in the Proof of Loss, Plaintiff appeared to rest its fraud allegations on the premise that Thornton concealed facts that led to the loss.  (See Defendant's Ex. 2 at pp. 7 - 9 (doc. # 19)).

Fraudulent suppression is recognized in Alabama as a species of fraud.  *See* ALA. CODE § 6-5-102 (1975).  The elements of a cause of action for fraudulent suppression require (1) a duty on the part of the actor to disclose an existing material fact; (2) concealment or suppression of that fact; (3) an inducement to act or refrain from acting; (4) actual damage as a proximate result; and (5) the actor's actual knowledge of the fact allegedly suppressed.  *See State Farm Fire & Cas. Co. v. Owen*, 729 So. 2d 834, 837 (Ala. 1998).

Viewed in the light most favorable to Plaintiff, the evidence fails to present even an inference of fraudulent suppression.  Most telling, nothing even indicates that Thornton had actual knowledge of the fact allegedly suppressed – the elaborate kiting scheme.

Thus, The Bank has failed to meet its burden of establishing the preliminary requirement for coverage under Insuring Agreement A – that Thornton's acts were dishonest or fraudulent. The court finds as a matter of law that the conduct of Thornton did not rise to the requirements of either dishonest or fraudulent acts.  Because the court finds that Thornton's acts were neither dishonest nor fraudulent, it pretermits discussion of the additional coverage requirement of

18

manifest intent to cause a loss or secure a benefit. Even if a genuine issue of material fact existed as to Thornton's intent as argued by the Plaintiff, but which the facts do not support, the Plaintiff's failure to establish a dishonest or fraudulent act is fatal to its contract claim. Therefore, Progressive owed no coverage under Insuring Agreement A, did not breach its contract with The Bank, and is entitled to summary judgment on the contract count of Plaintiff's complaint.

## IV.     Bad Faith Claim

The Plaintiff's complaint contains counts for breach of contract and bad faith. At the scheduling conference in this case, counsel suggested that the appropriate course of action would be to address the breach of contract issue – the "dishonesty issue"– before getting into the bad faith question. The court agreed, and entered a scheduling order in accordance with that approach. *See* Doc. 15.

When Defendant Progressive filed its summary judgment motion and brief on the dishonesty issue, it commented in a footnote that "because Progressive is entitled to summary judgment on the dishonesty/coverage (contract) issue, Plaintiff's bad faith claim also fails as a matter of law. *See Insurance Co. of North America v. Citizen's Bank of Thomasville,* 491 So. 2d 880, 883 (Ala. 1986) (unless insured is entitled to directed verdict on the contract issue, bad faith will not lie)." (Defendant's Brief fn. 9 at p. 15, doc. # 18). That footnote caused considerable consternation and resulted in the Plaintiff devoting four of its seven pages of legal argument to the question of bad faith. Although the court had not intended to address the bad faith claim at this stage, because the Plaintiff has already briefed the issue, and because Plaintiff's bad faith claim clearly fails to meet the legal standards required for such a cause of action, the court finds that requiring additional briefing on this issue would be a waste of judicial economy. *See Artistic*

*Entm't Co. v. City of Warner Robbins*, 331 F.3d 1196, 1201-02 (11th Cir. 2003) (holding that when the evidentiary record has been fully developed, the issue is purely legal, and the parties have had an opportunity to address the issue, a court may grant summary judgment even without formal notice.)

From Plaintiff's brief, the court cannot tell whether Plaintiff claims bad faith under the "normal" case standard, which requires that the insured be entitled to a directed verdict on the contract count to proceed on the bad faith claim,[5] or under the "abnormal" case, which focuses on the insurer's failure to adequately investigate the claim.[6]  Because the Plaintiff relies most extensively upon *State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293 (Ala. 1999), an abnormal case, the court will focus its analysis on whether any evidence supports Plaintiff's claim of bad faith under that theory.

In *Slade,* the court held that

> a plaintiff must establish that his or her claim is either the normal case or the abnormal case of bad faith.  To this date, the abnormal cases have been limited to those instances in which the plaintiff produced substantial evidence showing that the insurer (1) intentionally or recklessly failed to investigate the plaintiff's claim; (2) intentionally or recklessly failed to properly subject the plaintiff's claim to a cognitive evaluation or review; (3) created its own debatable reason for denying the plaintiff's claim; or (4) relied on an ambiguous portion of the policy as a lawful basis to deny the plaintiff's claim.

*Slade,* 747 So. 2d at 307-08.  The court further stated that an insurer, in properly conducting an

---

[5] *State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 304-06 (Ala. 1999); *see also Nat'l Sav. Life Ins. Co. v. Dutton*, 419 So. 2d 1357, 1362 (Ala.1982).

[6] *See Slade,* 747 So. 2d at 306-07; *see also Thomas v. Principal Fin. Group*, 566 So. 2d 735, 742-45 (Ala.1990).

investigation, must marshall all the facts before denying a loss and cannot limit its investigation to events that are not covered. *Id*. at 316.

The Bank then posits that "[n]ot only did Progressive fail to 'marshall all facts,' it also failed to properly analyze and apply the correct law regarding <u>intent</u>." (Plaintiff's Br. p. 13, doc. # 20 (emphasis added)). As previously noted, Plaintiff totally failed to address the key issue of whether Thornton's acts were dishonest or fraudulent, failed to cite any case authority that contradicted the legal standard used by Progressive to determine whether Thornton's actions were dishonest or fraudulent, and only argues that Thornton's actions demonstrate "willful ignorance" or "willful indifference."

Even under the abnormal bad faith case standard, Plaintiff failed to raise an inference, much less any indication that it could present substantial evidence that Progressive failed to properly investigate the claims, created its own debatable reason for denying the claim, or relied on an ambiguous policy provision to create a debatable reason to deny the claim. *See Slade*, 747 So. 2d at 307-08.  Instead, the law clearly supports the conclusion by Progressive, after a thorough investigation, that Thornton's acts were not dishonest or fraudulent.  Even if Progressive failed to consider evidence of "willful ignorance" or "willful indifference," such evidence was not probative of whether Thornton's acts rose to the standard of dishonest or fraudulent conduct so as to trigger coverage.  Having failed to present to Progressive sufficient evidence of the preliminary requirement of a dishonest or fraudulent act, The Bank cannot claim that Progressive acted in bad faith by failing "to properly analyze and apply the correct law regarding intent."  As the Plaintiff acknowledges in its brief, the policy requires that "'[s]uch dishonest or fraudulent acts must be committed by the employee with ... manifest intent.'"

21

(Plaintiff's Brief at 13, doc. 20, quoting Bond, Plaintiff's Exhibit 1.)  The Plaintiff cannot pass the first threshold of establishing a dishonest or fraudulent act and, therefore, cannot succeed on its breach of contract or bad faith claim.

For the reasons stated above, the court therefore finds that Progressive is entitled to summary judgment on both the breach of contract claim and the bad faith claim, and Plaintiff's complaint must be dismissed with prejudice.

A separate order will be entered contemporaneously.

DONE and ORDERED this 30th day of March 2005.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE